UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

AUTO-OWNERS INSURANCE COMPANY,
a Michigan corporation,

Plaintiff,

v.

SUMMIT PARK TOWNHOME ASSOCIATION,
a Colorado corporation,

Defendant.

**COMPLAINT FOR DECLARATORY JUDGMENT AND JURY DEMAND**

Plaintiff, Auto-Owners Insurance Company ("Auto-Owners"), by and through its attorneys, Gregory R. Giometti & Associates, P.C., pursuant to the Declaratory Judgment Act, as codified, 28 U.S.C. § 2201, and F.R.C.P. 38, 39 and 57, hereby submits its Complaint for Declaratory Judgment and Jury Demand, stating as follows:

**PARTIES**

1.      Plaintiff, Auto-Owners, is a Michigan corporation, with its principal place of business in 6101 Anacapri Blvd., Lansing, Michigan 48917. Auto-Owners is licensed and authorized to transact business and to issue insurance policies in the State of Colorado.

2.      Defendant, Summit Park Townhome Association ("Summit Park") is a Colorado Non-profit Corporation, organized under the laws of the State of Colorado, with its principal place of business at 27 Inverness Drive East, Englewood, Colorado 80112. Summit Park is a homeowner's association, engaged in the business of maintenance, preservation, and

1

architectural control of residential lots and common areas within certain real property located in the City and County of Denver, State of Colorado.

3.      In 2013, Auto-Owners issued policy number 74416480-13 (the "Policy") to Summit Park, which included, *inter alia*, building and personal property coverage for a fifty-seven building condominium complex. The Policy was issued with effective dates of March 1, 2013 through March 1, 2014. True and accurate copies of pertinent parts of the Commercial Property Coverage of the Policy are attached hereto as **Exhibit A**, with the Declarations pages at AO (Summit Park) 008891-008953.

4.      The Policy provides coverage for "direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." *Id.* at AO (Summit Park) 009045. This coverage, like other types of coverage provided by the Policy, is subject to the Policy's coverage limitations, conditions, and exclusions.

5.      On or about September 14, 2013, a hail storm moved through the region of Colorado in which the Summit Park complex sits. Following the storm, Summit Park made a claim under the Policy for property damage on the Summit Park premises that was allegedly due to hail damage. Thereafter, Auto-Owners and Summit Park undertook an investigation of the alleged property damage, which has led to a dispute on numerous issues, including, but not limited to, the scope of the alleged damage, when the alleged damage occurred, and the scope of coverage under the Policy.

6.      On November 12, 2014, Auto-Owners received a letter of representation from the Merlin Law Group, P.A., explaining that it represented Summit Park in this matter and directing

2

all further communications from Auto-Owners or its representatives be addressed to the Merlin Law Group, P.A.

7.      On December 8, 2014, Auto-Owners, through counsel, sent a letter to Corey Harris of the Merlin Law Group, P.A., identifying the disputes that remain open on Summit Park's claim, explaining Auto-Owners' coverage position, and reserving any and all rights Auto-Owners has under the Policy.

8.      Auto-Owners seeks a declaratory judgment as to the parties' respective rights and obligations under the Policy.

## JURISDICTION AND VENUE

9.      Based upon the sequence of events described above, and set forth in more detail below, an actual controversy has arisen between Auto-Owners and Summit Park as to their respective rights and obligations under the Policy with respect to Summit Park's property damage claim, and whether the Policy provides coverage for the claim.

10.     First, an actual controversy exists as to whether the Policy provides any coverage for the alleged damage, based on the parties' disagreement as to when the damage actually occurred, and whether the alleged damage occurred during the effective dates of the Policy.

11.     In addition, assuming that Summit Park's alleged damages actually occurred while the Policy was in effect, an actual controversy exists as to whether the claim is limited or barred by coverage limitations, conditions, and exclusions in the Policy.

12.     Furthermore, in the event that the Policy does provide coverage for the alleged damage, an actual controversy exists as to whether the Policy requires Auto-Owners to repair and/or replace undamaged portions of the Summit Park property to allow for "matching."

13.     Also, in the event that the Policy does provide coverage for the alleged damage, an actual controversy exists as to whether Summit Park breached its duty to cooperate in the investigation of the claim, as required under the Policy. Summit Park's failure to cooperate could reduce or negate coverage under the Policy.

14.     The amount in controversy between Auto-Owners and Summit Park exceeds seventy-five thousand dollars ($75,000) because Summit Park seeks to recover a total of $7,372,093.45 under the Policy for the alleged property damage at the Summit Park property.

15.     This Court has jurisdiction under 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy in this matter exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs. This Court also has jurisdiction under 28 U.S.C. §§ 2201(a) and 2202 because Auto-Owners seeks declaratory relief concerning an actual controversy within this Court's jurisdiction.

16.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b) because Summit Park is a Nonprofit Corporation organized in Colorado, and the events giving rise to Summit Park's property damage claim, and the adjustment thereof, occurred in this District. Venue in this District is also appropriate because this action addresses an insurance dispute involving a contract negotiated and issued in Colorado regarding alleged property damage that occurred in Colorado.

## APPLICABLE POLICY PROVISIONS

17.     The Commercial Property Coverage of the Policy contains the following pertinent provisions:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**

**A.     COVERAGE**

We will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

\* \* \*

**E.      LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

\* \* \*

**3.      Duties In The Event Of Loss Or Damage**

**a.**      You must see that the following are done in the event of loss or damage to Covered Property:

\* \* \*

**(2)**      Give us prompt notice of the loss or damage. Include a description of the property involved.

**(3)**      As soon as possible, give us a description of how, when and where the loss or damage occurred.

**(4)**      Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

**(5)**      At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

**(6)**      As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

**(7)** Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

**(8)** Cooperate with us in the investigation or settlement of the claim.

\* \* \*

**4.** **Loss Payment**

**a.** In the event of loss or damage covered by this Coverage Form, at our option, we will either:

**(1)** Pay the value of loss or damaged property;

**(2)** Pay the cost of repairing or replacing the lost or damaged property;

\* \* \*

**(4)** Repair, rebuild or replace the property with other property of like kind and quality.

**b.** We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

\* \* \*

**f.** We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if:

**(1)** You have complied with all of the terms of this Coverage Part; and

**(2)** **(a)** We have reached agreement with you on the amount of loss; or

6

**(b)**     An appraisal award has been made.

\* \* \*

**G.     OPTIONAL COVERAGES**

If shown in the Declarations, the following Optional Coverages apply separately to each item.

\* \* \*

**3.     Replacement Cost**

\* \* \*

**e.**     We will not pay more for loss or damage on a replacement cost basis than the least of:

\* \* \*

**(2)**     The cost to replace, on the same premises, the lost or damaged property with other property:

**(a)**     Of comparable material and quality; and

\* \* \*

**(3)**     The amount you actually spend that is necessary to repair or replace the lost or damaged property. \* \* \*

*See* **Exhibit A**, AO (Summit Park) 009045-009056.

18.     The Policy also contains Form 54082 (2-05), titled **CAUSES OF LOSS –**

**SPECIAL FORM**. This form contains the following pertinent provisions:

**A.     COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

**1.**     Excluded in Section B., Exclusions; or

**2.** Limited in Section C., Limitations;

that follow.

**B.** **EXCLUSIONS**

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

    **a.** **Ordinance or Law**

        The enforcement of any ordinance or law:

        **(1)** Regulating the construction, use or repair of any property; or

        **(2)** Requiring the tearing down of any property, including the cost of removing its debris.

* * *

    **g.** **Water**

* * *

Exclusions B.1.a. through B.1.h. apply whether or not the loss event results in widespread damage or affects a substantial area.

* * *

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

* * *

    **d.** **(1)** Wear and tear;

        **(2)** Rust, corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

* * *

        **(4)** Settling, cracking, shrinking or expansion;

8

* * *

**(7)**    The following causes of loss to personal property:

    **(a)** Dampness or dryness of atmosphere;

    **(b)** Changes in or extremes of temperature; or

    **(c)** Marring or scratching.

But if loss or damage by the "specified causes of loss" or building glass breakage results, we will pay for that resulting loss or damage.

* * *

**f.**    Continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more.

* * *

**j.**    Rain, snow, ice or sleet to personal property in the open.

**3.**    We will not pay for loss or damage caused by or resulting from any of the following. But if loss or damage by a Covered Cause of Loss results, we will pay for the resulting loss or damage.

**a.**    Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the loss or damage.

* * *

**c.**    Faulty, inadequate or defective:

**(1)**    Planning, zoning, development, surveying, siting;

**(2)**    Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

**(3)**    Materials used in repair, construction, renovation or remodeling; or

9

        **(4)**     Maintenance;

of part or all of any property on or off the described premises.

\* \* \*

## C.    LIMITATIONS

    **1.**    We will not pay for loss of or damage to:

\* \* \*

        **c.**    The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

                **(1)**    The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

                **(2)**    The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

        \* \* \*

        **e.**    \* \* \* [I]nstances where there is no physical evidence to show what happened to the property.

        **f.**    Gutters and downspouts caused by or resulting from weight of snow, ice or sleet.

        \* \* \*

*See* **Exhibit A**, AO (Summit Park) 009034-009042.

## <u>GENERAL ALLEGATIONS</u>

    19.    As discussed briefly above, this case arises from Summit Park's claim to recover

insurance benefits from Auto-Owners under the Policy for alleged hail damage to the Summit Park property. This claim was first reported by Auto-Owners on September 17, 2013 via email from Cherry Creek Insurance Group, Summit Park's insurance agent.

20.      In September 2013, Summit Park, through its agent Cherry Creek Insurance Group, asserted a claim under the Policy for property damage, after an alleged hailstorm on or about September 14, 2013 purportedly damaged some of the condominiums at the Summit Park property. A Property Loss Notice was transmitted to Auto-Owners' claims department on September 17, 2013, assigned claim number 74-4147-13, and referred to adjuster Michael Weiland for handling. A true and accurate copy of the Property Loss Notice, which was Auto-Owners' first notice of the claim, is attached hereto as **Exhibit B**.

21.      As part of the initial phases of the investigation of this claim, Auto-Owners retained Tom Raga from CAT Crew to inspect the Summit Park property. During his inspection of the property in September and October 2013, Mr. Raga of CAT Crew documented the condition of the property in thousands of photographs, which showed some hail damage in some areas, no damage in some areas, old damage, maintenance issues, and improper installation of building materials.

22.      On October 20, 2013, Mr. Raga prepared a status report. He indicated that he had performed 27 interior inspections regarding water damage. In his opinion, none of the damage resulted from a covered cause of loss. Half of the water was entering sub-surface. The rest of the water was entering through leaking skylights, flashing and leaks around fireplaces/crickets. By this date Mr. Raga had inspected and written estimates for 29 of the 57 buildings. Hail damage was minimal. There were one to two hits per square on the south slopes and an occasional hit on

the east slopes. The ridge shingles were of poor quality, and he recommended replacement of all the ridge shingles. There was paint damage to the cedar fascia and windows on the south and east elevations. There was a small amount of hail damage to some vinyl siding.

23.     On October 29, 2013, Mr. Weiland of Auto-Owners sent Summit Park a Reservation of Rights letter regarding the interior water damage based upon Mr. Raga's findings that it appeared that water penetrated the interior of the buildings through skylights, roof flashing or lower level foundation walls. Mr. Weiland pointed out that coverage is excluded for water that enters a building through foundation walls or water that enters a building through doors, windows or other openings. In addition, coverage is excluded for damage to the interior of any building caused by rain or snow unless the building first sustains damage from a covered cause of loss through which the rain or snow enters the building.

24.     On November 13, 2013, Mr. Raga completed his final Loss Report. A true and accurate copy of Mr. Raga's Loss Report is attached hereto as **Exhibit C**. The report indicates that the complex was built in the early 1980's and all the roofs were replaced in 2000 due to a hail storm. Mr. Raga noted that the hail in the September 14, 2013 storm was not very large, but the volume was substantial. The storm came from the southeast. There was interior water damage to a number of units but Mr. Raga did not believe this was due to a covered cause of loss. With regard to the roof, Mr. Raga stated that the shingles were a 30-year laminate. He observed no hail hits on any north slope. Other than on ridges, one to three hits per square were observed on 10 to 15 buildings. The ridge shingles were low-grade, 20-year composition shingles, which are easily damaged; therefore, complete replacement of the ridge shingles was needed on all but about 10 of the 57 buildings. Mr. Raga noted that Mark Meyers, Summit Park's

12

roofer, jointly inspected the roofs on five different occasions, and they were in agreement about the scope of damage. In addition, Dale Lavene, Summit Park's painter, inspected 10 buildings together with Mr. Raga on October 30, and they were also in agreement on scope and pricing. With regard to the vinyl siding, Mr. Raga only allowed for complete replacement of the southern elevations on two buildings. For reasons that were not clear, "these lone two southern facing elevations were heavily damaged." Other than on these two elevations, minimal siding damage was observed on southern and eastern elevations. While Mr. Raga observed some damage on northern and western elevations, he did not include it in his scope. He noted there were numerous installation issues with the siding, which is a cause of some of the water intrusion. Mr. Raga noted that the furnace flue stacks have heavy damage; however, Mr. Raga and the roofer were in agreement that this damage was due to a 2000 hailstorm, since the flue stacks were not replaced at that time and the damage was not consistent with the 2013 storm. Likewise, Mr. Raga and the roofer agreed that the large dents on the small skylights were not consistent with the 2013 storm. Mr. Raga's total RCV amount was $153,162.51 and his ACV amount was $117,083.27. After subtracting the deductible of $25,000, the new ACV payment due the insured was $92,083.27.

25.     On December 13, 2013, payment of the ACV amount of $92,083.27 was authorized. A letter was sent to Summit Park indicating that the amount of recoverable depreciation was $36,079.24 and that Summit Park must notify Auto-Owners within 180 days after the loss of Summit Park's intent to replace the damaged property.

26.     On July 7, 2014, Mike Lindhurst of C3 Group, a public adjuster retained by Summit Park, sent Auto-Owners a letter notifying Auto-Owners that C3 Group had been retained by Summit Park. On July 13, 2014, Mr. Lindhurst sent Auto-Owners an email with an attached

letter of representation for Summit Park together with a copy of his estimate for damages. He requested Auto-Owners to contact his firm to schedule a re-inspection of the property. He indicated that he expected a response within five to ten business days to schedule a re-inspection of the property. C3 Group's estimate was for an RCV amount of $7,140,117.82 for the damaged buildings and an RCV amount of $7,418.84 for other structures.

27.    On August 8, 2014, Auto-Owners' Assistant Claims Manager. Chris Hoag, sent Summit Park a letter noting receipt of an estimate in the amount of $7,147,536.66 from Mr. Lindhurst. Mr. Hoag indicated that because of the discrepancy between the estimate written by Mr. Lindhurst and the estimate written by CAT Crew, Auto-Owners would be scheduling a time to re-inspect each building. Mr. Hoag also noted that a certified copy of the policy had been mailed to Mr. Lindhurst.

28.    On August 8, 2014, Mr. Hoag sent an email to Mr. Lindhurst notifying him that Gene Gibbs of Auto-Owners Insurance would be contacting him to set up a time to re-inspect all of the buildings at Summit Park. On the same date, Mr. Gibbs sent an email to Mr. Lindhurst, asking Mr. Lindhurst to contact him to coordinate the inspections. Mr. Gibbs then spoke with Mr. Lindhurst and confirmed that the inspections were okay during the following week.

29.    On August 12, 2014, Mr. Gibbs sent Mr. Lindhurst an email, confirming their telephone conversation that he would be arriving in Denver on August 13 and would like to begin the re-inspections on the morning of August 15.

30.    On August 14, 2014, Mr. Gibbs sent an email to Mr. Lindhurst stating that he had arrived in Denver on the day before and would like to begin his re-inspections on August 15. Mr. Lindhurst responded by saying his partner, Mr. Behrens, would meet him on site to go over the

first re-inspection.

31.     On August 15, 2014, at 8:25 p.m., Mr. Behrens sent Mr. Gibbs an email about the meeting that day. A true and accurate copy of Mr. Behrens' August 15, 2014 email has been attached hereto as **Exhibit D**. Mr. Behrens alleged that Mr. Gibbs was inconsistent in what he was considering to be hail damage. In addition, Mr. Behrens accused Mr. Gibbs of changing his position from being "liberal" in his assessment of hail damage to taking a "hard line stance."

32.     On August 16, 2014, at 5:17 a.m., Mr. Gibbs replied to Mr. Behrens. A true and accurate copy of Mr. Gibbs' August 16, 2014 email has been attached hereto as **Exhibit E**. Mr. Gibbs pointed out that "[t]his property has been inspected multiple times by various different parties including an independent adjuster, the insured's contractor of choice (roofer & painter), their maintenance man, an independent roofing consultant as well as myself. C3 Group is the only party to say there is extensive hail damage to the field shingles and other areas. Every other party involved was able to agree on scope of repairs and cost." Mr. Gibbs also stated that "the goal in re-inspections is to re-assess damages then attempt to resolve any discrepancies regarding scope of repairs & cost through reasonable compromise."

33.     On August 16, 2014, at 6:27 a.m., Mr. Behrens responded to Mr. Gibbs' email. A true and accurate copy of Mr. Behrens August 16, 2014 email is attached hereto as **Exhibit F**. He stated that he didn't know what roofer or painter Mr. Gibbs was talking about. Mr. Behrens also stated that it was possible that the inspection occurred so closely in time to the storm date that the granules had not had a chance to wash off and expose the hail hits. Mr. Behrens cited certain authorities to assert that outward damage to shingles from hail may not be apparent until months or years later. Mr. Behrens concludes: "Please stop ignoring damages because the first adjuster

and 'roofer' didn't see them.  Please have an honest look at these as well."

34.    On August 28, 2014, a sworn Proof of Loss ("POL") was completed for a claimed RCV amount of $7,372,093.45 and an ACV amount of $6,659,776.46. These amounts were after subtraction of the deductible of $25,000. The POL was based upon an estimate prepared by Mike Lindhurst of C3 Group. True and accurate copies of pertinent portions of Mr. Lindhurt's estimate are attached hereto as **Exhibit G**. The estimate contains an explanatory note that because the current vinyl siding is no longer available, C3 Group has included an estimate for vinyl siding replacement on every building to maintain the visual consistency that existed pre-loss. The note also indicates that wood windows sustained damage throughout the complex, the majority of which can be repaired through sanding or painting. Finally, the note indicates that since 40-year roofing is no longer available, C3 Group has requested 50-year roofing for replacement. In the "Recap by Category" section of the estimate, the following amounts are claimed for different categories: roofing -- $2,637,504.31; siding -- $1,064,156.84; painting -- $524,483.22; general demolition -- $506,854.25; insulation -- $199,297.43; soffit, fascia & gutter -- $185,890.06; skylights -- $178,465.76; scaffolding -- $161,104.92; labor -- $142,956.80; and fireplaces -- $141,573.96. On August 29, 2014, Mr. Behrens sent Mr. Hoag and Mr. Gibbs an email with the attached POL and C3 Group's estimate of the damage.

35.    On September 15, 2014, Mr. Hoag sent Summit Park a letter responding to Mr. Behrens' email of August 29, 2014. The letter disputes Mr. Behrens' contention that Mr. Gibbs refused to do any test squares after the first building was completed. Photographs depict test squares on every building. The letter also indicates that Auto-Owners is unable to accept or reject the POL submitted on August 29, 2014, because Mr. Gibbs had not yet been able to complete his

estimate. The letter states that it was expected that Mr. Gibbs would complete his estimate by November 1, 2014. Finally, the letter indicates that the re-inspection had suggested that there may have been hail damage that occurred before September 14, 2013 and after Auto-Owners' initial inspection that ended on October 30, 2013.

36.     On September 30, 2014, Mr. Behrens sent Mr. Hoag an email notifying Auto-Owners of a new hail peril with significant hail on September 29, 2014. The email indicated that Summit Park believed that the roof and siding were a total loss before this new peril. Furthermore, the email indicated it did not constitute submission of a new claim, and it did not request the opening of a new claim.

37.     On October 16, 2014, Mr. Gibbs completed his estimate. True and accurate copies of pertinent portions of Mr. Gibbs' estimate are attached hereto as **Exhibit H**. The estimate is broken down by category for each location. The following RCV/ACV amounts were estimated by category: (1) General Demolition -- $49,218.38/42,218.38; (2) HVAC -- $13,202.10/0.00; (3) Painting -- $30,506.56/21,827.77; (4) Roofing -- $58,275.25/37,343.79; (5) Scaffolding -- $8,620.00/8,620.00; (6) Siding – $190,712.48/$140,637.95; (7) Soffit, Fascia & Gutter -- $7,596.21/$5,735.45; and (8) Window Reglazing & Repair -- $1,093.83/925.09. Like Mr. Raga, Mr. Gibbs took several thousand photographs documenting the condition of the buildings.

38.     On October 20, 2014, Rimkus Consulting sent Auto-Owners a meteorology report of October 20, 2014 regarding hail storms at the Summit Park property from 2012 through 2014. A true and accurate copy of Rimkus Consulting's report is attached hereto as **Exhibit I**. The report notes that significant hail is defined as hail half an inch or larger in diameter. The report indicates that significant hail (1.00 to 1.50 inches in diameter) likely occurred at the property on

June 6, 2012. There was a hail storm on September 14, 2013, but the hail was not significant. Significant hail possibly occurred on May 20, 2014, and probably occurred on September 29, 2014.

39.     On October 29, 2014, Mr. Hoag sent Summit Park a letter regarding Mr. Gibbs' August 2014 inspection of the Summit Park property. The letter indicates that, based upon a report from ITEL, Mr. Gibbs determined that the current siding on the buildings is no longer available. Therefore, Auto-Owners decided to change its estimate to include replacement of the elevations with damage from the hail storm. The letter also requested that a shingle be sent to Auto-Owners for analysis by ITEL. In addition, enclosed with the letter was a copy of Mr. Gibbs' estimate, a check in the amount of $153,333.30, and an Advance Payment Receipt. The check for $153,333.50 represented the difference between the new ACV of $270,416.57, less the deductible of $25,000 and the check for $92,083.27 issued on December 23, 2013. The letter also indicates that the property may have sustained hail damage before and after the initial inspection in September 2013. Based upon this fact, Mr. Hoag requested exterior maintenance records from January 1, 2012 through the present, as well as meeting minutes from the Summit Park board meetings for the same period. Mr. Hoag also advised Summit Park that Auto-Owners was hiring Higgins & Associates ("Higgins") to inspect the property and provide an expert opinion regarding the damage sustained during the September 14, 2013 hail storm. The POL of August 29, 2014 was rejected because it included damages unrelated to the date of loss. Finally, the letter confirms Auto-Owners' understanding that Summit Park was withdrawing any claim for hail damage resulting from the September 29, 2014 hail storm.

40.     On October 29, 2014, at 3:47 p.m., Mr. Behrens sent Mr. Hoag an email with his

18

response to Mr. Hoag's letter of that date. Mr. Behrens stated that, in light of the fact that Auto-Owners had discovered that the siding was no longer made or available, "the insured is entitled to have the buildings brought back to pre-loss condition." Mr. Behrens stated that his estimate "included a full replacement of the siding on the community because the color, reveal, size, and grain pattern is no longer available, as you have come to find out."

41.     On October 30, 2014, at 3:12 p.m., Mr. Hoag sent Summit Park an email attaching a copy of Auto-Owners' revised estimate from Mr. Gibbs for the hail damage that may have resulted from the September 14, 2013 storm. The estimate is for an RCV amount of $368,361.23 and an ACV amount of $270,416.57.

42.     On October 30, 2014, at 7:09 p.m., Mr. Behrens responded to Mr. Hoag's email, stating that under Auto-Owners' proposed repair method Summit Park "has in essence lost value to the community. This has nothing to do with matching at all as we are not talking about paint on different elevations, rather an entire system with exact characteristics, look, pattern, reveal, size, and aesthetics, being changed." Mr. Behrens then goes on to say that the loss payments section of the policy states: "'We will repair, rebuild or replace the property with other property of like kind and quality.'"

43.     On November 3, 2014, Peter Marxhausen, an engineer employed by Higgins, sent an email to Mr. Behrens notifying him that Auto-Owners had asked Higgins to look at the siding and roofs at Summit Park. He indicated he could start his inspection as early as November 11, 2014 and asked Mr. Behrens to confirm when it would be okay for him to start his examination.

44.     On November 4, 2014, at 2:30 p.m., Mr. Hoag sent Mr. Behrens an email responding to various correspondences from Summit Park. Mr. Hoag indicated that, contrary to

Mr. Behrens' statement in his October 30, 2014 email, Auto-Owners did timely respond to the POL. Mr. Hoag also mentioned a meeting at 3:00 p.m. on Thursday and sought confirmation that Mr. Behrens or Summit Park's contractor would be available to remove a sample shingle.

45.     On November 4, 2014, at 3:27 p.m., Mr. Behrens responded to Mr. Hoag's email. In response to Mr. Hoag's inquiry about removal of a shingle, he asserted that Mr. Gibbs and Mr. Tant had already taken part of the siding without C3 Group's knowledge or permission. He also stated that he would not have a contractor available and would not accept liability for removal of a shingle.

46.     On November 5, 2014, Mr. Hoag sent a letter to Summit Park noting that there is a disagreement about the type of shingles on the roofs. C3 Group claims that the shingles are 40-year shingles, and Auto-Owners' investigation indicates that the shingles are 30/35-year shingles. To resolve this issue, Auto-Owners wished to send a shingle sample to ITEL. Mr. Hoag noted that, as an insurance company, Auto-Owners is not authorized to remove any shingles, so Mr. Hoag requested that Summit Park have its contractor available to obtain a shingle sample. Mr. Hoag also responded to Mr. Behrens' allegation that Auto-Owners removed a piece of siding without permission. Mr. Hoag indicated that he had discussed this issue with Mr. Gibbs, who told him that Auto-Owners obtained a loose piece of siding from one elevation of the building located at 15158 E. Purdue Avenue. Both Mr. Lindhurst and Mr. Behrens were present when the sample was taken.

47.     On November 5, 2014, Mr. Behrens sent Mr. Hoag an email denying that either he or Mr. Lindhurst was present or knew of the removal of the siding. Mr. Behrens also enclosed 4 photos showing that the roofing material was 35-40 year roofing. He also stated that the first

20

photo showed a dent in the gutter from the September 14, 2013 hail storm. He stated he has thousands of photos showing hail damage from the September 2013 storm.

48.     On November 10, 2014, Mr. Marxhausen sent an email to Mr. Behrens stating that, since he had not received a return phone call or email, as of that date he was assuming that Higgins does not have permission to access the property or the roofs. He also pointed out that due to the cold temperatures and snow, Higgins would not be able to access the roofs until the coming Friday, at the earliest.

49.     On November 12, 2014, at 12:55 p.m., Mr. Hoag emailed a letter to Summit Park responding to Mr. Behrens' allegation that Auto-Owners had made a misleading statement about the removal of the siding sample. Mr. Hoag noted that the loose siding was obtained on Saturday, August 16, 2014 from building 27 at 15158 E. Purdue Avenue. Mr. Hoag enclosed a photo taken by Mr. Gibbs during the inspection of that location, which depicts Mr. Behrens on the roof.

50.     On November 12, 2014, at 1:13 p.m., Mr. Behrens sent Mr. Hoag an email confirming that he and Mr. Lindhurst were at the inspection of the building. However, he stated that they left while Mr. Gibbs and Mr. Tant were still on the roof, once the test squares were completed and "after our damages were ignored yet again." He denied that they were notified that siding was taken from that location.

51.     On November 17, 2014, at 8:49 a.m., Mr. Marxhausen sent an email to Mr. Behrens stating that, since he had not received a return phone call or email from him, he was assuming that Higgins does not have permission to access the property or the roofs.

52.     As of the filing of this Complaint and Jury Demand, Summit Park has not allowed

Higgins to inspect the Summit Park property.

## FIRST CLAIM FOR RELIEF

*(Declaratory Judgment That the Policy Does Not Provide Coverage*
*for Summit Park's Property Damage Claim)*

53.     Auto-Owners hereby incorporates by reference the averments of paragraphs 1 through 52 above as though fully set forth herein.

54.     The Policy does not provide coverage for Summit Park's claim for a number of reasons, including coverage limitations in the Policy, exclusionary language in the Policy, and Summit Park's failure to comply with its obligations under the Policy, including conditions precedent to coverage for the claim.

55.     The Policy contains a "cooperation clause," requiring Summit Park to cooperate with Auto-Owners in the investigation and settlement of the claim. Under Colorado law, an insured's duty to cooperate under a "cooperation clause" in an insurance policy requires joint operation or labor when an insurer has in good faith requested the insured's assistance.

56.     Summit Park has forfeited its right to recover under the Policy because, in violation of the duty to cooperate with Auto-Owners in the investigation and settlement of the claim, Summit Park has failed to cooperate in material and substantial respects. Summit Park has breached its duty to cooperate by failing to permit Auto-Owners to conduct necessary inspections of the Summit Park property in the course of the claim investigation. Summit Park's failure to cooperate constitutes a breach of the contract because such failure caused material and substantial disadvantage to Auto-Owners in its defense, settlement, and other handling of the claim.

57.     In addition, the Policy does not provide coverage for the claim, in whole or in

part, because, upon information and belief, the property damage did not occur within the effective dates of the Policy, as required by the contractual terms. Upon information and belief, the alleged property damage that is the subject of Summit Park's claim, in whole or in part, occurred before the effective date of the policy issued by Auto-Owners, and Auto-Owners therefore is not required to issue any payment for Summit Park's claim with respect to conditions and damage that existed before the effective date of the Policy, as there is no coverage under the Policy.

58.     Furthermore, the Policy may not provide coverage for all or part of Summit Park's property damage claim because the loss or damage may have been caused directly or indirectly by one or more excluded causes of loss, including but not limited to the following: the enforcement of any ordinance or law; water; fungi, wet rot, dry rot, and/or bacteria; wear and tear; rust, corrosion, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself, settling, cracking, shrinking, or expansion; mechanical breakdown; dampness or dryness of atmosphere; marring or scratching; continuous or repeated seepage or leakage of water; rain, snow, ice or sleet to personal property in the open; collapse; weather conditions; faulty inadequate or defective planning, zoning, development, surveying, siting; faulty inadequate or defective design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction; faulty inadequate or defective materials used in repair, construction, renovation, or remodeling; or faulty inadequate or defective maintenance.

## SECOND CLAIM FOR RELIEF

*(Alternatively, if Any Coverage Exists, Declaratory Judgment that Summit Park's Claim for Insurance Benefits Exceeds the Actual Scope of Damage and, thus, Is Not Covered by the Policy)*

59.     Auto-Owners hereby incorporates by reference the averments of paragraphs 1

through 59 above as though fully set forth herein.

60.     The Policy states that Auto-Owners "will pay for direct physical loss or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss." **Exhibit A**, AO (Summit Park) 009045. The "Causes of Loss – Special Form" excludes and limits coverage depending on the particular cause of damage, such as, but not limited to, wear and tear; water; or faulty, inadequate, or defective workmanship. *See id.* at AO (Summit Park) 009034-009042.

61.     Various reports promulgated by experts during the investigation of this claim explain that certain areas of Summit Park property have either no damage or damage that arises from maintenance issues, improper installation of building materials, and damage preceding the policy period. Nevertheless, Summit Park is seeking insurance benefits for alleged damage to all the roofs and all the siding on the property.

62.     A dispute as to the accurate scope of alleged, covered damage to the Summit Park property has arisen between Auto-Owners and Summit Park.

63.     These areas of alleged damage are either excluded by the Policy or coverage is limited by the Policy. Thus, the scope of damage claimed by Summit Park is erroneous and exceeds that which is offered under the Policy.

64.     Auto-Owners seeks a judicial decree that most, if not all, of the alleged damage claimed by Summit Park falls outside the actual and accurate scope of damage to covered property arising from a covered cause of loss; therefore, it would not be covered by the Policy.

### THIRD CLAIM FOR RELIEF

*(Alternatively, if Any Coverage Exists, Declaratory Judgment that Auto-Owners need not Repair and/or Replace Undamaged Property to Achieve "Matching")*

65.     Auto-Owners hereby incorporates by reference the averments of paragraphs 1 through 64 above as though fully set forth herein.

66.     The Policy states that Auto-Owners "will pay for direct physical loss or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss." **Exhibit A**, AO (Summit Park) 009045. The "Causes of Loss – Special Form" excludes and limits coverage depending on the particular cause of damage, such as, but not limited to, wear and tear; water; or faulty, inadequate, or defective workmanship. *See id.* at AO (Summit Park) 009034-009042.

67.     Various reports promulgated by experts during the investigation of this claim note that certain areas of Summit Park property have either no damage or damage that arises from maintenance issues, improper installation of building materials, and damage preceding the policy period.

68.     Despite the fact that certain areas of Summit Park's property are not damaged, Summit Park maintains that Auto-Owners must pay to replace all of the vinyl siding on the Summit Park property so as to achieve "matching."

69.     Replacing non-damaged areas of the property to achieve "matching" is not covered under the Policy; therefore, Summit Park seeks coverage that does not exist under the Policy or is excluded or limited by the Policy.

70.     In addition, case law does not support Summit Park's position that Auto-Owners need pay for the replacement of non-damaged property to achieve "matching." *See, e.g.*, *Green v. United Services Auto. Ass'n*, 936 A.2d 1178 (Pa. Super. 2007). Requiring replacement of all vinyl siding to achieve "matching," as Summit Park seeks, would be in contravention of the

Policy and lead to Summit Park obtaining a windfall.

71.     Auto-Owners seeks a judicial decree that it is obligated only to provide insurance coverage and benefits for property that is actually covered under the Policy, if any, and that replacement of non-damaged property to achieve "matching" is not required under the Policy, it is in contravention of the clear language of the Policy, and it would contravene public policy.

**AUTO-OWNERS REQUESTS A TRIAL TO A JURY ON ALL ISSUES**

WHEREFORE, Auto-Owners respectfully requests that the Court enter judgment in its favor and against Summit Park: (1) declaring that no coverage exists under the Policy with respect to the property damage claim asserted by Summit Park; (2) alternatively, if any coverage exists, the scope of the covered damage is far less than that asserted by Summit Park; or (3) alternatively, if any coverage exists, Auto-Owners is not required to repair and/or replace undamaged property to achieve aesthetic "matching"; and (4) for such other and further relief as the Court deems just and proper under the circumstances, including costs and attorney fees as provided by law.

Respectfully submitted this 18th day of December, 2014.

**GREGORY R. GIOMETTI & ASSOC., P.C.**

*Original Signature on File*
*s/ Gregory R. Giometti*
Gregory R. Giometti, #16868
Joseph M. Cox, #45215
Gregory R. Giometti & Associates, P.C.
50 S. Steele Street, Suite 480
Denver, CO 80209
Ph: (303) 333-1957
Fax: (303) 377-3460
E-mail: ggiometti@giomettilaw.com
E-mail: jcox@giomettilaw.com
*Attorneys for Plaintiff*

26