IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  14-cv-03417-LTB

AUTO-OWNERS INSURANCE COMPANY, a Michigan corporation,

      Plaintiff/Counter-Defendant,

v.

SUMMIT PARK TOWNHOME ASSOCIATION, a Colorado corporation,

      Defendant/Counter-Plaintiff.

_____

## MEMORANDUM OPINION AND ORDER
_____

**Babcock, J.**

      This insurance coverage dispute is before the Court on Plaintiff/Counter-Defendant Auto-Owners Insurance Company's ("Auto-Owners") Objection to George Keys Acting as Appraiser Based on Recently Discovered, Undisclosed Relationships with Defendant and Its Representatives [Doc. # 41].  I have reviewed the objection, the supplement thereto [Doc. # 55], Defendant/Counter-Plaintiff Summit Park Townhome Association's ("Summit Park") omnibus response [Doc. # 59], the reply [Doc. # 60], and the parties' notices of supplemental authority [Docs. # 63, 64, 66].  I have also considered the oral arguments presented at the hearing held on March 31, 2016.

      Consistent with my ruling on the record at the hearing, I conclude that the undisputed material facts establish that Keys, who is Summit Park's appraiser, is not "impartial" as required by the insurance policy in this case.  Summit Park's and Keys' failure to disclose material information regarding, among other things, Keys' extensive relationship with Summit Park's

counsel, violated my order requiring disclosure of facts that a reasonable person would consider likely to affect an appraiser's impartiality.  With Keys' involvement, the appraisal process yielded a "replacement cost value" of $10.87 million, which is $3.47 million—or 47%—greater than Summit Park's own adjuster calculated before this lawsuit was filed.  For the reasons set forth herein, I **SUSTAIN** the objection, **DISQUALIFY** Keys from serving as an appraiser in this matter, and **VACATE** the appraisal award lodged with the Court on December 23, 2015.

## I.  Facts

### A.  Procedural History

This is a declaratory judgment action brought by Auto-Owners to determine the extent of coverage under a property insurance policy it issued to Summit Park for damage to buildings on Summit Park's premises from a 2013 hailstorm.  At the outset of this case, Summit Park invoked the appraisal provision of the policy, under which "each party will select a competent and impartial appraiser," the court selects an umpire if the appraisers cannot agree on a selection, and a "decision agreed to by any two" of the three as to the "value of the property and amount of loss" "will be binding."  Doc. # 6-1 at 78.  The policy provides that Auto-Owners "will pay for covered loss or damage within 30 days after we receive the sworn proof of loss . . . if [a]n appraisal award has been made."  *Id.* at 80.

In April 2015, I ordered the appraisal process to proceed.  Doc. # 17.  In September 2015, upon the parties' failure to reach agreement on various aspects of the process, I imposed several guidelines to govern the process and appointed an umpire, Robert J. Norton.  Docs. # 25, 31.  One of the guidelines I imposed stated:

An individual who has a known, direct, and material interest in the outcome of the appraisal proceeding or a known, existing, and substantial relationship with a party may not serve as an appraiser. Each appraiser must, after making a reasonable inquiry, disclose to all parties and any other appraiser any known facts that a reasonable person would consider likely to affect his or her impartiality, including (a) a financial or personal interest in the outcome of the appraisal; and (b) a current or previous relationship with any of the parties (including their counsel or representatives) or with any of the participants in the appraisal proceeding, including licensed public adjusters, witnesses, another appraiser, or the umpire. Each appraiser shall have a continuing obligation to disclose to the parties and to any other appraiser any facts that he or she learns after accepting appointment that a reasonable person would consider likely to affect his or her impartiality. If an appraiser discloses a fact required to be disclosed pursuant to this paragraph and a party files an objection in this Court to the appointment or continued services of the appraiser no later than 15 days after becoming aware of such fact (or from the date of this order, whichever comes later), the objection may be a ground for vacating an award made by the appraiser. The same objection procedure shall apply in the event a party becomes aware of information bearing on an appraiser's competency.

Doc. # 25 at 12-13. I "emphasize[d]" that "only a 'reasonably inquiry' with respect to conflicts of interest" was required and, quoting Judge Jackson of this Court, wrote that "[t]he suggestion that retention of an expert on multiple engagements renders the expert other than impartial is a slippery slope." *Id.* at 11 (quoting *Colorado Hosp. Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821, at *2 (D. Colo. July 14, 2015)). I also stated that "[the parties and their counsel shall make every reasonable effort to ensure that the appraisal process proceeds in accordance with this order." *Id.* at 14-15. At the end of the order, I provided the following notice:

> NOTICE IS GIVEN THAT, IF THE COURT FINDS THAT THE
> PARTIES AND/OR THEIR COUNSEL HAVE NOT COMPLIED
> WITH THIS ORDER, THE COURT WILL IMPOSE
> SANCTIONS AGAINST THE PARTIES AND/OR THEIR
> COUNSEL PURSUANT TO THE COURT'S INHERENT
> AUTHORITY.

*Id.* at 15.  I will refer to this order as the "disclosure order."

## B. The Parties' Disclosures

On June 15, 2015, counsel for Summit Park, William Harris of the Merlin Law Group ("Merlin"), disclosed in a letter to counsel for Auto-Owners that Keys "does not have any significant prior business relationship with the Merlin Law Group."  Doc. # 60-7.  Mr. Harris added that Keys "has acted as a public adjuster and/or appraiser on behalf of policyholders that the Merlin Law Group has represented in the past, however, this obviously does not affect his ability to act as an appraiser in this matter."  *Id.*  On June 19, 2015, Auto-Owners' counsel responded that "[t]he apparently numerous relationships that Keys had with Merlin Group and its clients raise a serious concern of Keys' impartiality" and requested "that Keys provide a disclosure of his relationships with policyholders represented by the Merlin Law Group, how he and his firm were compensated, the number of times he served in the policyholders' roles [sic] as a public adjuster and/or appraiser . . . and the details of any services Keys has provided as an expert (as a retained or non-retained expert) through the Merlin Law Group."  Doc. # 60-8. Neither Keys nor Summit Park's counsel ever made the more detailed disclosures requested in this letter.  On November 24, 2015, following the Court's disclosure order, Keys disclosed in an email to Auto-Owners' counsel as follows: "I do not have any substantial business relationship or financial interest in Merlin Law Group.  There have been cases where both Merlin Law Group

and Keys Claims Consultants [Keys' business] acted for the same insured but under separate contracts." Doc. # 60-12.

## C.  The Appraisal Award

In December 2015, the appraisal panel issued its award.  Doc. # 35.  The award is signed by the umpire, Mr. Norton, and Defendant's appraiser, George Keys, but not by Auto-Owners' appraiser.  On January 20, 2016, Auto-Owners paid Summit Park the "actual cash value" ("ACV") set forth in the appraisal award, including the costs to replace undamaged vinyl siding to achieve matching, a disputed coverage issue not yet determined by the Court, and excluding prior payments made by Auto-Owners.  Doc. # 59-23.  (The ACV is the replacement cost value, or RCV, less depreciation; the policy provides that the RCV will not be paid "until the lost or damaged property is actually repaired or replaced."  Doc. # 6-1 at 84.)  In a letter accompanying the payment, Auto-Owners' counsel stated that "Auto-Owners is making this payment under a full and complete reservation of all of its rights under the policy and applicable law, and the making of this payment should not be construed as an admission of liability by Auto-Owners for any or all of the amount hereby paid, or the amounts previously paid."  *Id.* at 1.  Auto-Owners' counsel further stated that "Auto-Owners does not waive . . . [its] objection to Keys as an appraiser and any other issues currently pending, or that may be asserted, in [this] action, including any grounds for recoupment of any amounts that have been paid to [Summit Park]."  *Id.* at 3.  Auto-Owners moved to amend its complaint to assert, *inter alia*, a claim for recoupment of the appraisal award.  Doc. # 48.  I granted that motion at the hearing on the instant objection for reasons that will be set forth in a separate order.

**D.  The Objection**

On January 14, 2016, Auto-Owners filed the instant objection, in which it argues that Keys is not impartial as required by the appraisal provision.  As noted, the objection has been fully briefed and argued.  The briefs contain numerous attachments.  The following material facts do not appear to be in dispute.  I resolve the objection on the basis of these facts.

The facts fall into several categories.  First, Auto-Owners has identified matters in which Summit Park's counsel, Merlin, or attorneys presently affiliated with Merlin, represented Keys or his company.  This includes representing Keys personally in two separate lawsuits in Florida in 1995 and 1997, respectively; filing articles of incorporation with the Florida Secretary of State in 1997 on behalf of a public adjusting business for which Keys served as vice president; serving as that corporation's registered agent for 10 years; and serving as the registered agent in Texas from 2006 to 2008 for Keys Claims Consultants, Inc., the business through which Keys has been rendering his services in this case.  Docs. # 55-2, 55-3, 55-4, 55-5.  Summit Park points out that these matters were handled by Merlin attorneys who are not involved in this case.  Doc. # 59 at 40.

Second, Auto-Owners highlights other joint activities undertaken by Keys and Merlin attorneys.  For example, Keys and Merlin founder Chip Merlin founded the Florida Association of Public Insurance Adjusters ("FAPIA"), whose stated "number one goal is to protect policyholders and the public adjusting profession."  Doc. # 55-23.  While serving as the president of FAPIA, Keys presented Mr. Merlin an award for being a "Gold sponsor" of FAPIA.  Doc. # 55-26.  FAPIA is affiliated with a political action committee that solicits contributions "to further the legislative agenda of FAPIA."  Doc. # 55-23.  In addition, Keys and a Merlin attorney

6

who is counsel of record for Summit Park in this case, David Pettinato, recently taught a workshop together at an annual conference of the Windstorm Insurance Network in Orlando. Doc. # 55-27.

Third, Auto-Owners' reply brief lists 33 cases in which Keys served as either an appraiser or expert witness for the same client Merlin represented.  Doc. # 60-1.  At the hearing, Summit Park's counsel did not dispute this figure.  Relatedly, Mr. Pettinato provided a testimonial for Keys' marketing brochure stating that "Both Keys and his staff have assisted me as well as my firm in resolving an untold number of large multi-million dollar losses to an amicable resolution and settlement to the policyholders' benefit and satisfaction."  Doc. # 55-6 at 5.

Fourth, Auto-Owners cites facts that it believes demonstrates that Keys is "completely devoted to policyholders."  Doc. # 55 at 5.  For example, Keys gave a presentation regarding how to "harvest the claim money" from a particular insurance company, "QBE," "and how to use QBE's contractual provision for appraisal to short circuit a lengthy adjustment."  Doc. # 55 at 6.  Summit Park points out that the presentation Keys gave focused solely on QBE—which Summit Park claims "consistently delayed" claims after the hurricanes of 2004 and 2005—and "was intended to educate public adjusters about QBE, warn them of the tactics that were being used, and provide thoughts on how a public adjuster could effectively represent the policyholder in such situations."  Doc. # 59 at 30-31.  Similarly, Auto-Owners states that Keys has launched a "natural disaster insurance recovery" firm called "Risk Worldwide" whose stated purpose is "[t]o shift the balance of power from the insurer to the policy holder."  Doc. # 55-12.  In addition, Auto-Owners cites comments from Keys' website that it argues demonstrates that Keys

is "firmly entrenched on the side of the policyholders," such as Keys' statement that he "has dedicated his professional life to being a voice for policyholders in property insurance claims" and his statement that he "was taught to always handle a claim as if my momma was the insured."  Doc. # 55-10.

Fifth, Auto-Owners notes that Summit Park initially retained Keys under a contract that fixed his compensation at "$350 per hour as well as expenses not to exceed 10% of the amounts paid to" Summit Park in this case.  Doc. # 55 at 9-10; Doc. # 55-19.  Auto-Owners notes that Keys was appointed as an appraiser in April 2015 and that he "was working under the capped contingency fee agreement . . . for approximately four months," at which time the agreement was amended to remove the "not to exceed" language.  Doc. # 55 at 10.  Summit Park fixes the time from Keys' appointment to the execution of the amended agreement at "less than 90 days."  Doc. # 59 at 48.

## II.  Analysis

### A.  Waiver

Summit Park argues that Auto-Owners waived any objections regarding the appraisal award by paying the award.  Under Colorado law, which the parties agree applies here, an insurer may pay an insured under a reservation of rights and then seek to recoup its payment. *See Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1091-92 (10th Cir. 2010).  An insurer may lose the right to contest coverage where it fails to make a reservation of rights. *See Management Specialists v. Northfield Ins. Co.*, 117 P.3d 32, 37 (Colo. App. 2004); *see also Nikolai v. Farmers Alliance Mut. Ins. Co.*, 830 P.2d 1070, 1073 (Colo. App. 1991).

As set forth above, Auto-Owners explicitly made a full reservation of rights when it paid the appraisal award and, accordingly, has not waived the right to seek recoupment of that payment.  Summit Park cites cases in which the insurer made payment without having reserved its rights or took other actions that might have led the insured to believe the insurer was not contesting coverage.  *See, e.g., Pueblo Country Club v. AXA Corp. Sols. Ins. Co.*, No. 05-cv-01296-WYD-MJW, 2007 WL 951790 (D. Colo. Mar. 28, 2007) (insurer failed to reserve rights until after payment of settlement to third party).  No such circumstances exist here and, therefore, these authorities are inapplicable.  In addition, the policy may reasonably be read to require Auto-Owners to pay an appraisal award within 30 days.  *See* Doc. # 6-1 at 80 (providing that Auto-Owners "will pay for covered loss or damage within 30 days after we receive the sworn proof of loss . . . if [a]n appraisal award has been made").  Summit Park's waiver argument is therefore without merit.**B.  Impartiality**

The policy does not define the term "impartial."  Neither the parties nor the Court have located any Colorado appellate authority construing the term in the context of an appraisal provision like the one here.  Under Colorado law, "[w]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language."  *Ad Two, Inc. v. City & Cty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000).  In the disclosure order, I found the definition of a "neutral arbitrator" set forth in the Colorado Uniform Arbitration Act, Colo. Rev. Stat. § 13-22-211, helpful in providing basic guidance to the parties.  *See* Doc. # 25 at 12.  I ruled that "[a]n individual who has a known, direct, and material interest in the outcome of the appraisal proceeding or a known, existing, and substantial relationship with a party may not serve as an

9

appraiser." Doc. # 25. I did not indicate that this definition was all-encompassing with respect to impartiality.

Colorado case law regarding the neutrality required of arbitrators provides additional guidance. An arbitrator must "exercise a high degree of impartiality, without the slightest degree of friendship or favor toward either party." *Noffsinger v. Thompson*, 54 P.2d 683, 683 (Colo. 1936). And "[e]vident partiality has been found when a reasonable person would have to conclude that an arbitrator would be predisposed to favor one party to the arbitration." *McNaughton & Rodgers v. Besser*, 932 P.2d 819, 822 (Colo. App. 1996). In this regard, a "pecuniary interest" or the "existence of an adversarial or sympathetic relationship" between an arbitrator and a party's counsel are "[f]acts indicating [an arbitrator's] bias." *See id.*; *see also* 15 Couch on Ins. § 211:33 (section on "Arbitrators, Appraisers and Proceedings Before Them" providing that "[d]isinterest in the matter does not mean merely a lack of pecuniary interest, but is used in a broader sense, as impartial, fair, open-minded, and without partisanship, prejudice, or bias").

Based on these authorities, Keys cannot be considered impartial. His relationship with Merlin goes well beyond the mere "retention of an expert on multiple engagements" that I suggested would be permissible in the disclosure order. Doc. # 25 at 11. In addition to working on dozens of prior cases in which Keys was retained by the policyholder, Merlin and/or Merlin attorneys have served as Keys' personal counsel, served as incorporator and registered agent for Keys' companies, taught with Keys, and donated to a Keys-led group involved in pro-policyholder lobbying. These aspects of the relationship between Keys and Merlin, viewed collectively, make clear that he cannot satisfy any of the standards of impartiality set forth

above, whether framed in terms of "a known, existing, and substantial relationship with a party," "friendship or favor" towards a party, a "sympathetic relationship" towards a party, "partisanship," or a "predispos[ition] to favor one party."

I am not the first judge to disqualify Keys from serving as an appraiser on this basis; a state court judge recently did so in a case in which Keys and lawyers at another law firm, the Childress Duffy firm, were both working for the policyholder. *See Axis Surplus Ins. Co. v. CityCenter West LP,* No. 2015 CV 30453 (Colo. Dist. Ct. Weld Cnty. Mar. 14, 2016) [Doc. # 63-1]. The court noted that Keys' relationship with lawyers at the firm was sufficient to disqualify him from serving as an impartial appraiser "based only on past involvement in cases in which those lawyers were representing one of the parties." *Id.* at 2. The court held that the fact that Keys had formed a business partnership with some of the lawyers, "advocated in support of positions taken by" them, and "socialized with them" only compounded the problem. *Id.*

While Keys' relationship with Merlin is sufficient by itself to render him other than impartial, the totality of the circumstances here make this conclusion unavoidable. As noted above, Keys has made numerous comments suggesting a bias in favor of policyholders. The initial fee agreement under which Keys was initially retained in this case—which capped his fees and expenses at 10% of Summit Park's recovery—raises further concerns. Judge Jackson of this Court recently vacated an appraisal award made by an appraiser whose fee was capped at "5% of the replacement cost value of the final claims if an umpire is involved." *Colorado Hosp. Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821, at *2 (D. Colo. July 14, 2015). He noted that because "the higher his appraisal, the higher the cap on his fee," the appraiser "cannot be considered to be 'impartial' under any reasonable definition of that term."

11

*Id.* Judge Jackson rejected the argument that because the appraiser's appraisal "was prepared before the umpire was selected and while he was still on an hourly fee," the "motive to reach a higher appraisal" was eliminated. *Id.* at *3.

Here, Summit Park points out that the initial agreement with Keys was amended in July 2015—about three months after Keys' appointment as an appraiser and "well before any substantive work with the appraisal panel occurred"—to remove the contingent cap on his compensation. Doc. # 59 at 49. Notably, however, Summit Park does not deny that Keys performed at least some work while the initial agreement was in place. Summit Park argues that the contingent cap was merely intended to "limit the amounts that would be charged to the policyholder in the event that the appraisal panel determined that only a limited amount was owed," rather than incentivize a higher appraisal award. *Id.* at 48. But this argument only highlights the problem: an appraiser operating under such an agreement has a motive to ensure that the appraisal panel *does not* "determine[] that only a limited amount was owed," in Summit Park's words, but, rather, determines that a *greater amount* was owed. The fact that Keys was operating under the agreement, even for a short period, is enough, by itself, to render him other than impartial. I note that, before this lawsuit was filed, Summit Park's public adjuster estimated a replacement cost value of $7,140,117.82 for the damaged buildings, including replacement of undamaged vinyl siding to achieve matching. *See* 2d Am. Compl. ¶ 28 [Doc. # 6]. The corresponding figure in the appraisal award in which Keys participated, by contrast, is $10,870,090.96, an increase of $3.47 million, or 47%. Doc. # 35. Such a dramatic increase, coinciding with Keys' involvement in this case, confirms my doubts regarding his impartiality.

Despite the foregoing, the extent of Summit Park's disclosure to Auto-Owners regarding Keys was that Keys "has acted as a public adjuster and/or appraiser on behalf of policyholders that the Merlin Law Group has represented in the past"; neither Summit Park nor Merlin made any effort to disclose the number of times Merlin attorneys had worked together or the other aspects of their relationship outlined above.  Doc. # 60-7.  Keys' similar disclosure that he and Merlin had previously "acted for the same insured" was similarly lacking.  Doc. # 60-12.  And his representation that he did "not have any substantial business relationship . . . [with] Merlin Law Group" was, at best, misleading.  Doc. # 60-12.  In addition, Keys' original fee agreement was not disclosed until December 2015.  As the court in *Axis Surplus* noted in disqualifying Keys, "[w]hat is even more troubling is that Keys chose not to disclose this information" because, "[e]ven if Keys believed he had no legal obligation to [do so], he had to know that this information would cause [the insurer] concerns."  *Axis Surplus, supra*, at 2.  "Instead of being aboveboard and demonstrating his neutrality, [Keys'] nondisclosure only raises suspicions about his impartiality and creates the appearance that he was trying to hide" the damaging information. *Id.* at 2-3.  These comments ring equally true here.

While it is disappointing that—as Summit Park points out—Auto-Owners failed to seek relief from the Court when it received the insufficient disclosures from Merlin and Keys (in June 2015 and November 2015, respectively), this does not absolve Merlin or Keys from responsibility.  The disclosure order imposed on each appraiser a duty to disclose "known facts that a reasonable person would consider likely to affect his or her impartiality," including "a current or previous relationship with any of the parties (including their counsel or representatives)."  Doc. # 25 at 12-13.  And the order required "[t]he parties and their counsel

[to] make every reasonable effort to ensure that the appraisal process proceeds in accordance with" the order.  The order further cautioned that I would impose sanctions against the parties and/or their counsel pursuant to the Court's inherent authority if I found that they had not complied with the order.  *Id.* at 15.  The effect of these rulings was to impose a duty of disclosure on each side of this case—on each party and its respective appraiser and counsel—rather than to impose a duty to investigate the opposing side's appraiser, as Summit Park's argument suggests.

In this regard, I find it troubling that one of the Merlin attorneys who has appeared in this case, David Pettinato, provided more detail about Merlin's relationship with Keys in a brochure for Keys' business—a brochure in which he is quoted as saying that "[b]oth Keys and his staff have assisted me as well as my firm in resolving an untold number of large multi-million dollar losses to an amicable resolution and settlement to the policyholders' benefit and satisfaction," Doc. # 55-6 at 5—than he did in his disclosures to Auto-Owners before this Court.  Similarly, Mr. Harris, another Merlin attorney who has appeared in this case, acknowledged at the hearing that Merlin assisted Keys in making the disclosure in which Keys stated that he did "not have any substantial business relationship . . . [with] Merlin Law Group."  Doc. # 60-12.

My disclosure order required a "reasonable" inquiry regarding conflicts of interest, and these facts suggest that Merlin and, specifically, the Merlin attorneys who have appeared in this case, failed to take this duty seriously.  As I stated in the order, my goal in imposing guidelines to govern the appraisal process was to "protect the integrity of the process and increase the likelihood of a valid appraisal award."  Doc. # 25 at 10.  Unfortunately, counsel's conduct has impugned the integrity of not only the appraisal process but also the Court.  It is "not only within the judicial power to . . . protect the integrity of this court, it is a *duty*."  *Schmidt v. Ford Motor*

*Co.*, 112 F.R.D. 216, 220 (D. Colo. 1986) (emphasis in original).  I agree with Auto-Owners that a potential basis for sanctions exists and direct further briefing on this issue, as set forth below.

Finally, I reject Summit Park's argument that Auto-Owners failed to raise its objection pursuant to the 15-day deadline set forth in my disclosure order.  While Summit Park posits that Auto-Owners "was aware of Mr. Keys' qualifications prior to the time the award was entered," Keys' qualifications are not the issue here; rather, it is the totality of the circumstances related to his ability to serve as an impartial appraiser, as discussed above.  (While Auto-Owners does make arguments regarding Keys' competence, I need not and do not address them here, and I note that they appear to be without merit in any event.)  In any case, the objection deadline in the disclosure order applies only to information actually disclosed by the opposing side.  *See* Doc. # 25 at 12-13 (noting that "*[i]f an appraiser discloses a fact required to be disclosed pursuant to this paragraph* and a party files an objection in this Court to the appointment or continued services of the appraiser no later than 15 days after becoming aware of such fact (or from the date of this order, whichever comes later), the objection may be a ground for vacating an award made by the appraiser") (emphasis added).  Summit Park and Keys failed to disclose the information Auto-Owners raises in its objection and, accordingly, Summit Park's argument regarding the timeliness of Auto-Owners' objection must fail.

### III.  Conclusion

It is accordingly

**ORDERED** that the objection [Doc. # 41] is **SUSTAINED** and Keys is **DISQUALIFIED** from acting as an appraiser in this matter.  It is further

**ORDERED** that the appraisal award filed with the Court on December 23, 2015 is

**VACATED**.  It is further

**ORDERED** that Auto-Owners shall file with this Court by April 15, 2016 any motion for

sanctions that it desires to file.  Upon receiving such a motion, I will set a schedule for further

briefing.  At the appropriate time, I anticipate setting a status hearing to discuss the status of this

case in light of the rulings contained herein.

**DATED**: April   5  , 2016, at Denver, Colorado.

BY THE COURT:


  s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE

16