IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  14-cv-03417-LTB

AUTO-OWNERS INSURANCE COMPANY, a Michigan corporation,

　　　　　Plaintiff/Counter-Defendant,

v.

SUMMIT PARK TOWNHOME ASSOCIATION, a Colorado corporation,

　　　　　Defendant/Counter-Plaintiff.

_____

**MEMORANDUM OPINION AND ORDER**
_____

**Babcock, J.**

　　　　This insurance coverage dispute is before me on Auto-Owners Insurance Company's

("Auto-Owners") Motion for Sanctions [Doc. # 71].  I have reviewed the motion; the response of

Summit Park Townhome Association ("Summit Park") [Doc. # 94]; the response of Summit

Park's former counsel of record, Merlin Law Group P.A., and Merlin attorneys William C.

Harris and David J. Pettinato individually [Doc. # 92]; Auto-Owners' reply [Doc. # 99]; Auto-

Owners' notice withdrawing certain statements in its reply [Doc. #100]; and all attachments to

those filings.  I previously took oral argument on issues relevant to deciding the motion and have

determined that further oral argument would not be of material assistance.

　　　　For the following reasons, I **GRANT** the motion and **DISMISS WITH PREJUDICE**

Summit Park's counterclaims in this matter pursuant to the Court's inherent authority.  I also

assess an award of attorney's fees and expenses against Harris and Pettinato individually

pursuant to 28 U.S.C. § 1927. Finally, I award interest to Auto-Owners for the period Summit

Park wrongfully withheld the appraisal funds pursuant to Colo. Rev. Stat. § 5-12-102(1)(b).

## I. Facts

### A. Background

Much of the background to the instant dispute has been set forth in a prior order, but I

summarize it here for the reader's convenience. *See Auto-Owners Ins. Co. v. Summit Park*

*Townhome Ass'n,* No. 14-CV-03417-LTB, 2016 WL 1321507, at *1 (D. Colo. Apr. 5, 2016)

[Doc. # 69]. Auto-Owners brought this declaratory judgment action to determine the extent of

coverage for damage caused by a 2013 hailstorm under a property insurance policy it issued to

Summit Park. Summit Park has since asserted counterclaims alleging breach of contract, bad

faith breach of insurance contract, and unreasonable delay or denial of benefits under Colo. Rev.

Stat. §§ 10-3-1115, -1116. *See* Doc. # 45 at 19-23. From the outset of this case until May 2016,

when they withdrew, Summit Park's counsel of record was Merlin Law Group, P.A., and Merlin

attorneys William "Corey" Harris and David J. Pettinato (collectively, "Merlin").

Shortly after this case was filed, Summit Park invoked the appraisal provision of the

policy, under which "each party will select a competent and impartial appraiser," the court

selects an umpire if the appraisers cannot agree on a selection, and a "decision agreed to by any

two" of the three as to the "value of the property and amount of loss" "will be binding." Doc. #

6-1 at 78. In April 2015, I ordered the appraisal process to proceed. Doc. # 17. Summit Park

selected George Keys as its appraiser and Auto-Owners selected Jim Koontz as its appraiser.

Docs. # 24, 29. In September 2015, upon the parties' failure to reach agreement on various

aspects of the process, I imposed several guidelines.  Docs. # 25.  One of the guidelines I

imposed stated:

> An individual who has a known, direct, and material interest in the
> outcome of the appraisal proceeding or a known, existing, and
> substantial relationship with a party may not serve as an appraiser.
> Each appraiser must, after making a reasonable inquiry, disclose to
> all parties and any other appraiser any known facts that a
> reasonable person would consider likely to affect his or her
> impartiality, including (a) a financial or personal interest in the
> outcome of the appraisal; and (b) a current or previous relationship
> with any of the parties (including their counsel or representatives)
> or with any of the participants in the appraisal proceeding,
> including licensed public adjusters, witnesses, another appraiser, or
> the umpire.  Each appraiser shall have a continuing obligation to
> disclose to the parties and to any other appraiser any facts that he
> or she learns after accepting appointment that a reasonable person
> would consider likely to affect his or her impartiality.  If an
> appraiser discloses a fact required to be disclosed pursuant to this
> paragraph and a party files an objection in this Court to the
> appointment or continued services of the appraiser no later than 15
> days after becoming aware of such fact (or from the date of this
> order, whichever comes later), the objection may be a ground for
> vacating an award made by the appraiser.  The same objection
> procedure shall apply in the event a party becomes aware of
> information bearing on an appraiser's competency.

*Id.* at 12-13.  I explained that this guideline "will minimize the risk that the appraisal award will

need to be vacated" pursuant to the policy language requiring that the appraisers be impartial.

*Id.* at 9.  I also directed that "[t]he parties and their counsel shall make every reasonable effort to

ensure that the appraisal process proceeds in accordance with this order."  *Id.* at 14-15.  At the

end of the order, I provided the following notice:

> NOTICE IS GIVEN THAT, IF THE COURT FINDS THAT THE
> PARTIES AND/OR THEIR COUNSEL HAVE NOT COMPLIED
> WITH THIS ORDER, THE COURT WILL IMPOSE
> SANCTIONS AGAINST THE PARTIES AND/OR THEIR
> COUNSEL PURSUANT TO THE COURT'S INHERENT
> AUTHORITY.

*Id.* at 15.  I will refer to this as the "disclosure order."  Upon the appraisers' failure to reach an agreement regarding the selection of an umpire, I appointed Robert J. Norton to serve in this role.  Doc. # 31.

## B.  Summit Park's Disclosures

On June 15, 2015, Harris disclosed in a letter to counsel for Auto-Owners that Keys "does not have any significant prior business relationship with the Merlin Law Group."  Doc. # 60-7.  Harris added that Keys "has acted as a public adjuster and/or appraiser on behalf of policyholders that the Merlin Law Group has represented in the past, however, this obviously does not affect his ability to act as an appraiser in this matter."  *Id.*  On June 19, 2015, Auto-Owners' counsel responded that "[t]he apparently numerous relationships that Keys had with Merlin Group and its clients raise a serious concern of Keys' impartiality" and requested "that Keys provide a disclosure of his relationships with policyholders represented by the Merlin Law Group, how he and his firm were compensated, the number of times he served in the policyholders' roles [sic] as a public adjuster and/or appraiser . . . and the details of any services Keys has provided as an expert (as a retained or non-retained expert) through the Merlin Law Group."  Doc. # 60-8.

Neither Keys nor Merlin ever made the more detailed disclosures requested in this letter.  On November 24, 2015, following the Court's disclosure order, Keys disclosed in an email to Auto-Owners' counsel as follows: "I do not have any substantial business relationship or financial interest in Merlin Law Group.  There have been cases where both Merlin Law Group and Keys Claims Consultants [Keys' business] acted for the same insured but under separate

contracts." Doc. # 60-12.  At a hearing, Harris acknowledged that "we" (presumably one or more Merlin attorneys) assisted Keys in making this disclosure.  Doc. # 69 at 13-14.

### C.  The Appraisal Award

In December 2015, the appraisal panel issued its award.  Doc. # 35.  The award was signed by Norton (the umpire) and Keys, but not by Koontz (Auto-Owners' chosen appraiser).  On January 20, 2016, Auto-Owners paid Summit Park $9,700,025.71, the "actual cash value" ("ACV") of the appraisal award (less certain adjustments not relevant here) under a reservation of rights in accordance with the policy's requirement that Auto-Owners "pay for covered loss or damage within 30 days after we receive the sworn proof of loss . . . if [a]n appraisal award has been made."  Doc. # 6-1 at 78; Doc. # 59-23.  The ACV is the replacement cost value ("RCV") less depreciation; the policy provides that the RCV will not be paid "until the lost or damaged property is actually repaired or replaced."  Doc. # 6-1 at 84.  Before this lawsuit was filed, Summit Park's public adjuster estimated an RCV of $7,140,117.82 for the damaged buildings, including replacement of undamaged vinyl siding to achieve matching, a disputed issue.  *See* 2d Am. Compl. ¶ 28 [Doc. # 6].  The corresponding figure in the appraisal award in which Keys participated, by contrast, was $10,870,090.96, an increase of $3.47 million, or 47%.  Doc. # 35.

### D.  Vacatur of Appraisal Award

On January 14, 2016, Auto-Owners objected to Keys' involvement in the appraisal process and moved to vacate the appraisal award on the grounds that it had discovered facts showing that Keys was not impartial as required by the appraisal provision.  Docs. # 41, 55.  I heard two hours of oral argument on March 31, 2016, at the end of which I sustained the objection and vacated the appraisal award.  Doc. # 68.  In a written order dated April 5, 2016, I

explained that Keys cannot be considered impartial because, "[i]n addition to working on dozens of prior cases in which Keys was retained by the policyholder, Merlin and/or Merlin attorneys have served as Keys' personal counsel, served as incorporator and registered agent for Keys' companies, taught with Keys, and donated to a Keys-led group involved in pro-policyholder lobbying." Doc. # 69 at 10.  I also noted that Summit Park initially had retained Keys under a contract that fixed his compensation at "$350 per hour as well as expenses not to exceed 10% of the amounts paid to" Summit Park in this case.  *Id.* at 11.  While the contingent-cap fee agreement was replaced three to four months into Keys' engagement, I explained that, because "the higher his appraisal, the higher the cap on his fee," Keys could not be considered impartial, even if he only worked under this agreement for a short period.  *Id.* (quoting *Colorado Hosp. Servs. Inc. v. Owners Ins. Co.*, No. 14-CV-001859-RBJ, 2015 WL 4245821, at *2 (D. Colo. July 14, 2015)).

I noted that my disclosure order required a reasonable inquiry into and disclosure of any facts a reasonable person would consider likely to affect the appraiser's impartiality.  Doc. # 69 at 13-14.  I concluded that Summit Park's disclosures did not meet this standard.  *Id.*  I noted that Pettinato had provided more detail about Merlin's extensive relationship with Keys in a brochure for Keys' business—a brochure in which he is quoted as saying that "[b]oth Keys and his staff have assisted me as well as my firm in resolving an untold number of large multi-million dollar losses to an amicable resolution and settlement to the policyholders' benefit and satisfaction"—than he did in his disclosures to Auto-Owners before this Court.  *Id.*  I also noted that Merlin assisted Keys in making the disclosure in which Keys stated that he did "not have any substantial business relationship . . . [with] Merlin Law Group."  *Id.*  I found that "counsel's

6

conduct has impugned the integrity of not only the appraisal process but also the Court" and invited the instant motion for sanctions.  *Id.* at 14-15.

## II.  Analysis

### A.  Dismissal of Counterclaims

Federal courts have the inherent "ability to fashion an appropriate sanction for conduct which abuses the judicial process."  *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1255 (10th Cir. 2015) (internal citation omitted).  This includes "the power to enter a default judgment."  *Klein v. Harper*, 777 F.3d 1144, 1147 (10th Cir. 2015) (internal citation and quotations omitted).  Federal Rule of Civil Procedure 41(b) recognizes that the Court may dismiss a claim or action where a "plaintiff fails to  . . . comply with these rules or a court order."

"Default judgment is a harsh sanction that should be used only if the failure to comply with court orders is the result of willfulness, bad faith, or any fault of the disobedient party rather than inability to comply."  *Klein*, 777 F.3d at 1147-48 (internal citation and quotations omitted).  A district court must ordinarily consider the following "*Ehrenhaus*" factors in determining whether a dismissal under Rule 41(b) is appropriate: (1) the degree of actual prejudice to the opposing party; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.  *Gripe v. City of Enid, Okl.*, 312 F.3d 1184, 1188 (10th Cir. 2002) (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992)).  "The factors do not create a rigid test but are simply criteria for the court to consider."  *Id.*  For the following reasons, I conclude that it is appropriate to dismiss Summit Park's counterclaims with prejudice.

### 1. Bad Faith

Before reaching the *Ehrenhaus* factors, I begin with the threshold issue of bad faith.  I find that Merlin—including Pettinato and Harris individually—acted in bad faith.  I begin with Merlin's failure to disclose key facts about the Merlin-Keys relationship, namely that Merlin and Keys had worked on behalf of the same insured in dozens of prior cases and that Merlin attorneys served as personal counsel to Keys and Keys' companies on multiple occasions.  Despite these facts, neither Pettinato, nor Harris, nor anyone else from the Merlin firm ever corrected Harris's disclosure that Keys "does not have any significant prior business relationship with the Merlin Law Group" or Keys' own, nearly identical disclosure.

No reasonable attorney could have believed that the withheld information was not called for by my disclosure order.  My disclosure order was clear that counsel were responsible for ensuring compliance with the order and that the order's obligations were continuing.  Pettinato's testimonial in Keys' brochure boasting of an "untold number of large multi-million dollar losses" that Keys and Merlin had jointly handled suggests that Pettinato had actual knowledge of the undisclosed facts but opted not to disclose them.  And Harris' acknowledgment that Merlin assisted Keys with his disclosures dispels any doubt that Merlin played an active role in crafting the disclosures.  These facts suggest a deliberateness with regard to Merlin's conduct that I find rises to bad faith.

But that is not all.  It appears that Merlin and Summit Park took steps to conceal the existence of the contingent-cap fee agreement under which Keys was originally retained in April 2015.  As noted, under this agreement, the limit of Keys' compensation and expenses would increase as the amounts recovered by Summit Park in this litigation increased.  This agreement

8

was replaced by one removing the contingent cap around July 2015.  In a December 4, 2015 examination under oath, however, Summit Park's representative, David Malucky, denied that any agreements other than the uncapped one had existed.  Doc. # 55-17 at 2.  And before the examination, Merlin failed to produce the agreement in response to Auto-Owners' request for all contracts with Keys.  Further, on December 21, 2015, in a letter to Auto-Owners' counsel, Harris disclosed the agreement but mischaracterized it as merely a "proposed" agreement that "would have" imposed a contingent cap.  Doc. # 59-41.  It was not until January 2016 that Malucky, via Merlin, submitted an errata sheet which revealed that an actual (not merely proposed) contingent-cap agreement had existed; his corrected testimony disclosed that "Mr. Keys initially was to receive $350 per hour as well as expenses not to exceed 10% of the amounts paid to the association."  Doc. # 55-19.  Perhaps unsurprisingly, this was after the appraisal award was filed with the Court on December 23, 2015.  The failure to disclose the original agreement in response to my disclosure order and the apparent efforts to conceal the original agreement further support a finding of bad faith on the part of Merlin.  I note that there can be little doubt that Merlin was aware of the initial agreement with Keys, as a pleading signed by Harris stated that Merlin handled the discussions with Mr. Keys regarding the agreement and "obtained" the initial agreement on Summit Park's behalf.  Doc. # 59 at 47.  I acknowledge Malucky's affidavit, in which he avers that his actions were "not the product of bad faith or improper motive on my part," but I do not find it entirely credible.  Doc. # 94-1 at 2.  In addition, it does nothing to mitigate Merlin's bad faith.

Harris and Pettinato have submitted affidavits averring that they must have misunderstood what I meant in my disclosure order when I required the appraisers to disclose

"any known facts that a reasonable person would consider likely to affect his or her impartiality." Docs. # 92-1, 92-2. The disclosure order, however, stated that such facts "includ[e] . . . a current or previous relationship with any of the parties (including their counsel or representatives)." Doc. # 25 at 12-13. And I ordered that "[t]he parties and their counsel shall make every reasonable effort to ensure that the appraisal process proceeds in accordance with this order." *Id.* at 14-15. Accordingly, I do not find Harris' and Pettinato's statements credible in the least. The disclosure order was clear that current and prior relationships between appraisers and counsel had to be disclosed and that the appraisers, the parties, and counsel were all jointly responsible for ensuring that this happened. While Merlin's and Keys' disclosures acknowledged that Merlin and Keys had been retained by the same insured in the past, they said nothing about the number of such engagements or the millions of dollars Merlin and Keys apparently earned from those engagements. They certainly said nothing about the prior work done for Keys and Keys' companies by Merlin attorneys. And, of course, they said nothing about the contingent-cap fee agreement.

Bad faith on the part of Harris and Pettinato has certainly been established. I note that it is proper to attribute Harris' and Pettinato's bad faith to the Merlin firm given that the lawyers' actions "were indistinguishable from those of [the] firm" and "in opposing [the] sanctions motion, the firm consistently accepted responsibility for conducting the underlying litigation." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012). Summit Park is also responsible for Harris' and Pettinato's actions. Clients are routinely subjected to "inherent power" sanctions for their lawyers' misconduct, particularly where the conduct was designed to benefit the client. *See Gripe*, 312 F.3d at 1188–89 (affirming sanction of dismissal of claims

10

based on attorney's misconduct and noting that "[a] litigant is bound by the actions of its

attorney, and the relative innocence of the litigant . . . does not constitute grounds for relief");

*Haeger v. Goodyear Tire & Rubber Co.*, 813 F.3d 1233, 1246 (9th Cir. 2016) (sanctioning client

because client was "deemed bound by the acts of [its lawyers] and is considered to have notice of

all facts, notice of which can be charged upon the attorney") (internal citation and quotations

omitted); *Smith v. United States*, 834 F.2d 166, 171 (10th Cir. 2016) (holding that "the lawyer

represents his client and the client is bound by that representation" where the "lawyer (or the

client) makes a tactical decision and [the lawyer's] noncompliance with the court's directive is

not a product of inadvertence"). In any event, Malucky's incorrect testimony suggests bad faith

on the part of Summit Park. Further, Harris (then Summit Park's counsel) stated in open court

that Summit Park made an "independent" "examination" of various appraisers and, after a

meeting in "executive session," "made the decision" that Keys "is who we would like to use."

Doc. # 99-3 at 42-43. Thus, Summit Park was aware of Keys' background and bears at least

some degree of responsibility for his selection and his inadequate disclosures.

   Finally, I reject Merlin's and Summit Park's argument that I did not have authority to

enter the disclosure order and find their continued defiance of that order to be further evidence of

bad faith. The disclosure order was a proper exercise of the Court's authority under Federal

Rule of Civil Procedure 16(c)(2)(L), the common law of appraisal, and the Court's inherent

supervisory power. In any event, this is not relevant to the instant sanctions issue. Even if the

order had been entered in error, the parties were still required to comply with it. *See, e.g.,*

*L'Ggrke v. Asset Plus Corp.*, No. 15-5059, 2016 WL 231150, at *2 (10th Cir. Jan. 20, 2016)

("But to be clear, even assuming purely for the sake of argument that the district court had

lacked jurisdiction, it still had jurisdiction to sanction Plaintiff for failure to comply with its orders."); *Coando v. Westport Res.*, 85 F. App'x 59, 62 (10th Cir. 2003) ("An order issued by a court with jurisdiction must be obeyed by the parties until it is reversed.") (alterations and citation omitted).  The proper means of contesting the Court's authority to enter the disclosure order was a motion for reconsideration or an appeal—not to violate the order.

### 2. *Ehrenhaus* Factors

I now turn to the *Ehrenhaus* factors.  First, Auto-Owners has been significantly prejudiced by Summit Park's and Merlin's conduct, most obviously by the last six months of litigation over Keys' partiality and the instant sanctions issue.  The eight months of litigation before that—regarding whether and under what terms the appraisal process would proceed—were also wasted because Summit Park's and Merlin's conduct led to the vacatur of the appraisal award.  Summit Park and Merlin have thus impeded Auto-Owners from achieving resolution of its claims in this declaratory judgment case.  This factor merits significant weight. Turning to the second factor, there has been massive interference with the judicial process. Summit Park's and Merlin's conduct has disrespected the Court's authority, increased the Court's workload, and generally interfered with the administration of justice.  *See Steckel v. Doe*, No. 08-cv-01652-LTB-CBS, 2009 WL 1174479, at *2 (D. Colo. Apr. 29, 2009) ("Judicial resources have been expended on setting, resetting, monitoring, and issuing orders in this civil action.").  This factor thus merits great weight.

In regard to the third factor, Summit Park bears some degree of culpability, both as the party responsible for Merlin's actions and in its own right.  As noted above, Summit Park played a role in selecting Keys in the first place, in failing to ensure that his disclosures were adequate,

and in failing to disclose information regarding the original contingent-cap fee agreement.  Thus, I give moderate weight to the third factor.  Fourth, in regard to warnings, I warned the parties in all capital letters in my disclosure order that "IF THE COURT FINDS THAT THE PARTIES AND/OR THEIR COUNSEL HAVE NOT COMPLIED WITH THIS ORDER, THE COURT WILL IMPOSE SANCTIONS."  Doc. # 25 at 15.  While I did not specifically reference dismissal, the warning was early, prominent, and phrased mandatorily.  At a status conference on March 16, 2016, after Auto-Owners filed its objections regarding Keys but before oral argument took place, I further cautioned Summit Park that the "objections are significant . . . in terms of the implications for this case" and for "judicial integrity."  Doc. # 67 at 3.  I warned that "there are implications potentially adverse to defense counsel" including "potential sanctions."  *Id.* at 4. The foregoing is certainly sufficient to constitute constructive (if not express) notice of dismissal, which the Tenth Circuit has held satisfies the fourth *Ehrenhaus* factor.  *See Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1150 (10th Cir. 2007).

Fifth, I have given serious consideration to the efficacy of lesser sanctions and have determined that only dismissal will serve the "principal purpose of punitive sanctions," which is deterrence.  *Farmer*, 791 F.3d at 1259.  The impact of the misconduct in this case could have been enormous if it had not been discovered.  This is not, for example, a case of deposition misconduct where perhaps a day's worth of counsel's time was wasted and the prejudice of the misconduct can easily be cured.  Rather, in no small part due to Merlin's efforts to withhold and conceal information about Keys' partiality, Keys was able to participate in the appraisal process and sign off on an appraisal providing an award $3.47 million greater—or 47% greater—than Summit Park's own adjuster calculated before this lawsuit was filed.  Where millions of dollars

13

are potentially at stake, imposing sanctions of merely attorney's fees and expenses does not adequately serve to deter Summit Park, Merlin, or other potential wrongdoers from engaging in similar conduct in the future.

In regard to the fifth factor, I also recognize that, over the past decade, Pettinato has been regularly sanctioned and/or admonished for litigation misconduct in Florida, to no apparent effect.  In 2006, U.S. District Judge Gregory Presnell imposed a sanction of attorney's fees and expenses against Pettinato for his deposition misconduct.  Doc. # 99-6.  In 2009, Florida Circuit Judge Timothy P. McCarthy recused himself from Pettinato's matters, telling Pettinato that "I do not trust you."  Doc. # 99-5.  In 2010, U.S. District Judge Virginia Hernandez Covington wrote that "Pettinato's reputation for candor has been questioned by this Court" and therefore "disregard[ed] Pettinato's opinions" regarding the appropriate hourly rate to apply in determining a motion for attorney's fees.  *See Ottaviano v. Nautilus Ins. Co.*, 717 F. Supp. 2d 1259, 1270 (M.D. Fla. 2010) (adopting report and recommendation of magistrate judge).  Finally, in 2012, U.S. District Judge Patricia Seitz told Pettinato that she "contemplated an order to show cause whether or not I should allow you to appear as counsel in this case" after reviewing his deposition conduct.  Doc. # 99-4 at 5.  In light of this history, I am convinced that only the harshest of sanctions may cause Pettinato and the Merlin firm to reexamine their approach to litigation.  Therefore, I give great weight to the fifth factor.

On balance, I conclude that the *Ehrenhaus* factors weigh in favor of dismissing Summit Park's counterclaims with prejudice.  This disposition makes it unnecessary for me to reach Auto-Owners' argument that Summit Park should be precluded from obtaining a second appraisal under the insurance policy.

**B. Attorney's Fees and Expenses**

Under 28 U.S.C. § 1927, "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." As discussed above, Harris and Pettinato engaged in unreasonable and vexatious conduct that resulted in a significant waste of resources by all involved in this litigation. Accordingly, an award pursuant to Section 1927 against Harris and Pettinato is appropriate.

I note that Section 1927 "indicates a purpose to compensate victims of abusive litigation practices, not to deter and punish offenders." *Hamilton v. Boise Cascade Exp.*, 519 F.3d 1197, 1205 (10th Cir. 2008). With this purpose in mind, I reject Auto-Owners' request for fees for "proceedings in this Court that relate to conducting the appraisal process" and "conducting the appraisal process itself" because Auto-Owners would have incurred these fees regardless of Harris' and Pettinato's misconduct. Mot. at 22 [Doc. # 71]. I grant the request, however, as to "Auto-Owners' investigation into George Keys and its objections to his participation in the appraisal," as this work would not have taken place in the absence of Harris' and Pettinato's misconduct. *Id.* The award shall be assessed against Harris and Pettinato jointly and severally.

**C. Interest**

Finally, Auto-Owners seeks "the full amount of interest owed on the $9.7 million in appraisal funds that Summit Park wrongfully possessed." Doc. # 71 at 21-22. Under Colo. Rev. Stat. § 5-12-102(1)(a), "wrongfully withheld" money earns interest at a rate of 8% per year from the date the wrongful withholding begins to the date of repayment. Consistent with my vacatur

15

of the appraisal award and imposition of sanctions, I find that the award was wrongfully withheld and will impose interest under this provision.  While Summit Park argues that interest should not be imposed as a sanction because Summit Park is a nonprofit homeowner's association and cannot afford to pay, I am imposing interest not as a sanction but pursuant to the cited statutory provision.

Auto-Owners submits that Summit Park retained the $9,700,025.71 in appraisal funds from February 19, 2016 until April 8, 2016, and that 8% interest during this period amounts to $104,175.62.  Auto-Owners further submits that Summit Park has already paid $6,378.09 in interest.  Summit Park has not disputed these dates or figures, and Auto-Owners' calculation appears correct.  Accordingly, I will award $97,797.53 in additional interest to Auto-Owners.  Finally, I emphasize that, because this is not a sanction, interest will be imposed only against the party, Summit Park, not Merlin or the individual attorneys.

### III.  Conclusion

It is accordingly

**ORDERED** that Plaintiff's Motion for Sanctions [Doc. # 71] is **GRANTED**.  It is further

**ORDERED** that Summit Park's counterclaims as set forth in its Answer [Doc. # 45] are **DISMISSED WITH PREJUDICE**.  It is further

**ORDERED** that Auto-Owners is awarded reasonable attorney's fees and expenses against Harris and Pettinato jointly and severally as set forth above, the amount of which will be fixed upon Auto-Owners' filing of a motion pursuant to D.COLO.LCivR 54.3.  It is further

**ORDERED** that Summit Park shall pay $97,797.53 to Auto-Owners, representing unpaid interest that accrued on the appraisal award during the period that Summit Park wrongfully withheld it.  It is further

**ORDERED** that judgment in Auto-Owners' favor shall enter in accordance with this order.

**DATED**: August __1__, 2016, at Denver, Colorado.

BY THE COURT:

  s/Lewis T. Babcock_____
LEWIS T. BABCOCK, JUDGE

17